UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RAMON K. JUSINO and ANN M. JUSINO,<br><br>Plaintiffs,<br>v.<br><br>NEW YORK CITY DEPARTMENT OF EDUCATION,<br><br>Defendant. | **MEMORANDUM AND ORDER**<br><br>22-cv-00853-LDH-ST |

L*A*SHANN D*E*ARCY HALL, United States District Judge:

Ramon K. Jusino and Ann M. Jusino (together, "Plaintiffs"), proceeding pro se, bring the instant action against the Department of Education of the City of New York ("Defendant" or the "DOE"), pursuant to the Americans with Disabilities Act of 1990 (the "ADA"), the Rehabilitation Act of 1973 (the "Rehabilitation Act"), the New York State Human Rights Law (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL"). Specifically, Plaintiffs assert claims for disability discrimination and retaliation. Defendant moves, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings.

## BACKGROUND[1]

Plaintiffs are the parents of W.J., a "non-speaking autistic" individual who is over the age of eighteen. (Compl. ¶¶ 3, 16, ECF No. 1.) W.J. was enrolled as a student within the DOE's educational program for children with disabilities from as early as February 2012 and entitled to continued enrollment up until June 30, 2025. (*Id.* ¶¶ 3, 8; *see id.* ¶ 9.)

---

[1] The following facts taken from the complaint are assumed to be true for the purpose of the instant motion, unless otherwise noted.

On or about July 1, 2015, Plaintiffs implemented a pedagogical method with W.J. known as the Rapid Prompting Method (the "RPM"), which was designed to assist individuals with non-speaking autism to better express themselves. (*Id.* ¶ 24; *see id.* ¶¶ 25, 29-30.) Under the RPM, teachers provide students with a selection of "written word choices," and students verbalize, write, or spell their response. (*Id.* ¶ 28.) Instruction under the RPM occurs at a regulated pace coinciding with the student's development and demonstration of "pragmatic cognitive and motor skills." (*Id.* ¶¶ 31-32; *see id.* ¶¶ 33-34.)

Between July 1, 2015 and November 5, 2017, Plaintiffs engaged in informal conversations with the DOE staff at W.J.'s school regarding the reevaluation of W.J. by the RPM. (*Id.* ¶ 35.) According to the Complaint, the DOE was "unresponsive" to Plaintiffs' request. (*Id.* ¶ 36.) However, Defendant subsequently agreed to reevaluate W.J. using the RPM at an appointment scheduled for November 6, 2017. (*Id.* ¶ 37.) On November 6, 2017, the DOE conducted a "[p]sychological [u]pdate" using the RPM instruction. (*Id.* ¶ 38.) In a report dated November 16, 2017, Cornelius Hodges, the school psychologist, concluded that W.J. had "much higher . . . cognitive function" than that previously assessed by the DOE and demonstrated an ability to "define words at a superior/very superior level" by using a letterboard. (*Id.* ¶ 38, 47; *see id.* ¶ 39.) Plaintiffs allege that, despite Mr. Hodges's findings, the DOE refused to incorporate the RPM into W.J.'s educational curriculum, as requested by Plaintiffs. (*Id.* ¶ 42.) Plaintiffs filed a due process complaint[2] on February 28, 2018, requesting, among other things, "a complete reassessment and reevaluation of W.J.'s intelligence, aptitude and achievement

---

[2] According to the Complaint, a "due process complaint" raises issues "related to the identification, evaluation, or educational placement of . . . special needs child[ren]. . . [and] typically [includes] a request for an [i]mpartial [h]earing." (*Id.* n.10.)

2

levels using his letter board and a qualified teacher trained in [the] RPM." (*Id.* ¶ 43 (alterations accepted).)

Thereafter, on May 10, 2018, an impartial hearing commenced before Impartial Hearing Officer ("IHO") John Farago. (*Id.* ¶ 44.) During this hearing, Mr. Hodges testified on his findings as to W.J., which were included in Mr. Hodges's report dated November 16, 2017. (*Id.* ¶¶ 46-47.) At some point during the hearing, IHO Farago ordered an "[i]ndependent [e]ducation [e]valuation" of W.J., to investigate whether services under the RPM would assist W.J. in his learning. (*Id.* ¶ 48.) The hearing was then adjourned until the competition of the evaluation. (*Id.*) The independent education evaluation, as well as the accompanying report, was completed as early as June 2018, but no later than July 2018. (*Id.* ¶ 49; *see id.* ¶ 50.) The report concluded that when W.J. was permitted to communicate using a letter board, and with support from a therapist trained in the RPM, his ability to express responses "vastly and demonstrably improved." (*See id.* ¶ 50.) On October 4, 2018, the impartial hearing before IHO Farago reconvened. (*Id.* ¶ 51.) During the hearing, Plaintiffs submitted into evidence the June or July 2018 report. (*Id.*) On October 16, 2018, IHO Farago found that "[W.J.'s] performance is radically different than it is without [the] RPM" and ordered the DOE to: (1) implement the RPM "through a trained provider" into W.J.'s individualized education program ("IEP"), which is a "legal document . . . that is developed for each public school child in the [United States] who [requires] special education"; (2) consider all recommendations as to in-school and out-of-school services for W.J., which were detailed in the November 16, 2017 and June or July 2018 reports; and (3) reimburse Plaintiffs for the documented costs associated with the RPM services provided to W.J. during the 2015-16, 2016-17, 2017-18, and 2018-19 school years. (*Id.* ¶ 52.) The DOE did not appeal IHO Farago's October 16, 2018 decision. (*Id.* ¶ 53.)

On March 29, 2019, the DOE incorporated the RPM services through a trained provider into W.J.'s IEP.  (*Id.* ¶ 54.)  Plaintiffs allege that, according to W.J.'s IEP from the same date, W.J. demonstrated "an ability to communicate and express age-appropriate intelligence using [the] RPM."  (*Id.* ¶ 55.)  Also included in the March 29, 2019 IEP was a testing accommodation, which permitted W.J.'s "use of approved assistive technology devices," like his letterboard or a provider trained in the RPM, "to allow for communication."  (*Id.* ¶¶ 57-58, 60.)  On July 6, 2019, Plaintiffs filed a due process complaint "challenging certain aspects of [the DOE's] March 29, 2019 IEP."  (*Id.* ¶ 61.)

On November 20, 2019, an impartial hearing commenced before IHO Edgar De Leon. (*Id.* ¶ 62.)  At the hearing, the DOE was represented by Jeanette Montolio, a school psychologist. (*Id.* ¶ 63.)  At the outset of the hearing, Ms. Montolio stated that W.J. "was provided with a free and appropriate education."  (*Id.* ¶ 64.)  Moreover, Marin Feuer, the head of W.J.'s IEP team and another school psychologist, testified at trial that W.J. received treatment under the RPM "for six hours a day in school."  (*Id.* ¶¶ 65-66.)  According to the Complaint, this testimony was false. (*Id.* ¶ 66.)  On April 3, 2020, pending IHO De Leon's determination as to Plaintiff's due process complaint, and without Plaintiffs' "knowledge, consent, or input," W.J.'s then-teacher, Lisa Herbst, altered W.J.'s IEP to exclude services under the RPM and testing accommodations.  (*Id.* ¶¶ 77-78, 80.)  On May 24, 2020, IHO De Leon found that the DOE had utilized the RPM instruction with W.J. and, therefore, had provided W.J. with appropriate education during the 2019-2020 school year.  (*Id.* ¶ 69.)  Plaintiffs appealed certain parts of IHO De Leon's decision to the New York State Office of Review.  (*Id.* ¶ 71.)  On August 6, 2020, "SRO" Justyn P. Bates issued a decision on appeal directing the DOE to continue utilization of the RPM instruction in W.J.'s "core instructional classes . . . on a going-forward basis."  (*Id.* ¶¶ 72-73.)  Plaintiffs allege

4

that SRO Bates's decision, as well as IHO De Leon's decision, was based on the testimony provided by Ms. Feuer at the impartial hearing before IHO De Leon. (*Id.* ¶ 74.)

On August 12, 2020, Plaintiffs inquired, via email, as to W.J.'s performance under the RPM. (*Id.* ¶ 81.) According to the complaint, Ms. Herbst "essentially admitted" that the RPM was not being utilized with W.J. as a result of the April 3, 2020 IEP. (*Id.*) Plaintiffs had not previously been apprised of the April 3, 2020 IEP. (*Id.* ¶ 82.) At a subsequent meeting between Plaintiffs and W.J.'s IEP team, Plaintiffs raised Ms. Herbst's omission of the RPM instruction in the April 3, 2020 IEP. (*Id.* ¶¶ 93-94, 96, 99.) In response, Ms. Herbst apologized and restored the services under the RPM to W.J.'s most recent IEP. (*Id.* ¶ 96.) However, according to Plaintiffs, the RPM instruction was not included onto that IEP. (*Id.* ¶¶ 97, 100.) On August 14, 2020, Plaintiffs filed a due process complaint "alleging, inter alia, that the April 3, 2020 IEP was illicit and that [the DOE] was not utilizing the mandated RPM [instruction] with W.J." (*Id.* ¶ 83.)

On February 25, 2021, an impartial hearing commenced before IHO Mindy Wolman. (*Id.* ¶ 84.) At the hearing, Ms. Montolio, again representing the DOE, stated that W.J. was "afforded a free and appropriated public education for the [2019-2020 and 2020-2021] school year[s]." (*Id.* ¶ 85.) Moreover, during the hearing, IHO Wolman set April 15, 2021 as the date on which the DOE would present its first witness. (*See id.* ¶ 87.) On April 15, 2021, the DOE failed to present any witness and, according to the Complaint, "conceded that [the DOE] had never meaningfully utilized the RPM [instruction] with W.J." (*Id.* ¶¶ 89-90.) On August 31, 2021, IHO Wolman issued her decision, in which she found that:

> The DOE had the burden of proving that the RPM services were provided. []It failed to meet its burden of proof on that issue. []Moreover, based on [Plaintiffs'] testimony and upon the documentary evidence submitted by [Plaintiffs], it is clear

5

> that the DOE did not, in fact, utilize the RPM [instruction] in any (let alone at all) of [W.J.'s] classes.

(*Id.* ¶ 91.)  Moreover, IHO Wolman directed the DOE to reimburse Plaintiffs for the documented costs of providing W.J. with services under the RPM during the 2019-2020 school year, as well as "during pendency of th[e] proceeding and any appeals thereof."  (*Id.*)  The DOE did not appeal IHO Wolman's findings.  (*Id.* ¶ 93.)  According to the complaint, the DOE, per the direction of IHO Farago and IHO Wolman, paid reimbursements to Plaintiffs for the expenses incurred by Plaintiffs in the use of the RPM instruction in home-based academic lessons.  (*Id.* ¶ 13.)  Plaintiffs further allege that they have exhausted all available administrative remedies. (*Id.* ¶¶ 10-11.)

**STANDARD OF REVIEW**

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *See Bank of New York v. First Millennium*, 607 F.3d 905, 922 (2d Cir. 2010) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)) ("The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings."). As such, to survive a motion for judgment on the pleadings, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556, 127 S. Ct. 1955). As with a motion to dismiss under Rule 12(b)(6), a motion for judgment on the pleadings pursuant to Rule 12(c) "must be decided solely on the pleadings before the

6

court, in addition to any materials implicitly or explicitly incorporated by reference into those pleadings." *U.S. v. Certain Real Property and Premises Known as 44 Autumn Ave., Brooklyn, N.Y.*, 156 F.R.D. 26, 30 (E.D.N.Y. 1994).  Furthermore, when a plaintiff proceeds pro se, the court will read her submissions liberally and "interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

## DISCUSSION

### I.   Discrimination

#### A.  Statutory Standing

##### *1.  Zone of Interest*

It is well settled that a plaintiff asserting a claim in federal court must establish that the statute under which he or she is suing "grants [him or her] the cause of action that [he or she] asserts." *Jeannot v. New York State*, 762 F. Supp. 3d 217, 236 (E.D.N.Y. 2025), *appeal withdrawn sub nom. Jeannot v. McDonald*, No. 25-314, 2025 WL 2320485 (2d Cir. July 14, 2025) (quoting *Bank of Am. Corp. v. City of Miami*, 581 U.S. at 189, 196-97 (2017)).  Stated differently, plaintiffs must satisfy "statutory standing."[3]  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4.  To determine whether a plaintiff has established statutory standing, courts presume that a statute "provides a cause of action only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Bank of Am. Corp.*, 581 U.S. at 197 (quoting *Lexmark*, 572 U.S. at 129 (internal quotation marks omitted)).

---

[3] For the purposes of this memorandum, the Court utilizes the term "statutory standing" as shorthand for the requirement that a plaintiff bringing a federal statutory claim have a cause of action under that statute.  Of note, however, in *Lexmark*, the Supreme Court explained that, while such an inquiry has been referred to as "'statutory standing' and treated . . . as effectively jurisdictional[,] . . . [this label], too, is misleading, since 'the absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction, *i.e.*, the court's statutory or constitutional power to adjudicate the case.'" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014).

As such, for a plaintiff to possess statutory standing, his or her interest must, *inter alia*, be "among the *sorts* of interests that [the statutes] are designed to protect." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (emphasis in original). This "limitation on the cause of action for judicial review . . . applies to all statutorily created causes of action . . . and is never negated." *Lexmark*, 572 U.S. at 129. That said, a court's "analysis of certain statutes [might] show that [the statutes] protect a more-than-usually expansive range of interests." *Id.* (internal quotation marks omitted) (alterations accepted). "Whether a plaintiff comes within the zone of interests is an issue that requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127.

The DOE contends that the ADA and the Rehabilitation Act were enacted to protect only those individuals with disabilities. (Def.'s Mem. L. Supp. Mot. Dismiss ("Def.'s Mem.") at 14, ECF No. 45.) And, as the DOE's argument goes, because Plaintiffs are not, themselves, disabled, Plaintiffs are outside of the "zone of interest" of each statute. (*See id.* at 13-14.) The Court disagrees.

"The ADA was enacted to 'provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'" *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (quoting 42 U.S.C. § 12101(b)(1)). Similarly, the Rehabilitation Act was enacted for the "purpose of . . . prohibit[ing] discrimination on the basis of [disability] . . . " *Stephanidis v. Yale University,* 652 F.Supp. 110, 113 (D. Conn. 1986), *aff'd,* 814 F.2d 654 (2d Cir. 1987). To that end, "[b]oth Title II of the ADA and . . . the Rehabilitation Act protect the rights of disabled individuals to participate in state-administered or funded services." *Davis v. Shah*, 821 F.3d 231, 259 (2d Cir. 2016). Under Title II of the ADA:

> [s]ubject to the provisions of th[e] subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  Moreover, the Rehabilitation Act provides that:

> [n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be . . . subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

Under Title II's enforcement provision, relief is extended to "*any person* alleging discrimination on the basis of disability."  42 U.S.C. § 12133 (emphasis added).  The Rehabilitation Act similarly extends its remedies to "any person aggrieved" by the discrimination of a person on the basis of his or her disability.  29 U.S.C. § 794a(a)(2).  By the plain meaning of each provision, a plaintiff need not be an individual with a disability to be entitled to relief under the ADA or the Rehabilitation Act:  the enforcement provision of each statute, instead, clearly states that relief is afforded to "any person" injured by a covered entity's disability discrimination, including against another individual with whom they are associated.  Indeed, the Second Circuit has long made clear that "the use of such broad language in the enforcement provisions of [Title II of the ADA and the Rehabilitation Act] evinces a congressional intent to define [statutory] standing to [assert] a [cause of] action under [the statutes] as broadly as is permitted by Article III of the Constitution."  *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (citation and internal quotations omitted), *recognized as superseded on other grounds, Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 (2d Cir. 2001).  As such, contrary to the DOE's contention, both qualified individuals with a disability and individuals who, despite not having a disability, allege discrimination based on their "association

9

with [such] persons" may assert a claim under either statute.[4]  *See id.* (finding that plaintiff-rehabilitation-center had "standing [to sue] under both Title II of the ADA and the Rehabilitation Act" based on the discrimination experienced by five of its disabled clients); *see also Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 280-82 (2d Cir. 2009) (Wesley, J., concurring and delivering the opinion of the Court) (finding that the "standing [or enforcement] provisions of the [Rehabilitation Act]" are interpreted "as broadly as possible under the Constitution," to confer statutory standing on those who have suffered "injuries due to their association with disabled person," including on "non-professional family members").  To put it differently, a plaintiff who alleges discrimination based on their association with a disabled individual "fall[s] within the zone of interests protected by [Title II of the ADA and the Rehabilitation Act]" and may, therefore, assert a cause of action under each statute.  *Bank of Am. Corp.*, 581 U.S. at 197 (citation and quotations omitted).[5]

---

[4] The DOE maintains that, by holding that "associational claims" implicate, *inter alia*, a "zone of interest" inquiry rather than prudential standing, the *Lexmark* Court "reframed its view of 'prudential standing'" and adopted a novel inquiry for assessing associational claims.  (*See* Def.'s Mem. at 13-14.)  Consequently, as the DOE contends, "any argument that Plaintiffs here may bring a claim of associational discrimination . . . 'is [thus] no longer available.'" (*Id.* at 14.)  Defendants are mistaken.  In *Lexmark*, the Supreme Court articulated that, "although [the Supreme Court] admittedly ha[d] placed [the zone-of-interest] test under the 'prudential' rubric in the past, . . . prudential standing is a misnomer as applied to the zone-of-interest analysis."  *Id.* at 127 (internal quotation marks and citation omitted).  Stated differently, the Supreme Court found that, prior to *Lexmark*, it had included the zone-of-interest test, which inquires "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim," as a part of prudential standing.  *Id.*  The Supreme Court, however, did not, as the DOE suggests, replace the inquiry under which claims, including associational claims, need now be assessed.  Indeed, the *Lexmark* Court made plain that the requirement to undergo a zone-of-interest analysis for statutory claims was longstanding, albeit misconstrued as a component of prudential standing.  *See id.* at 126 (explaining that, historically, prudential standing "encompass[ed] . . . the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked").  In any event, the DOE fails to advance a single argument outlining why Plaintiffs, as non-disabled individuals, do not fall within the zone of interest of either the ADA or the Rehabilitation Act.

[5] Further, as the DOE acknowledges, Title II's legislative history confirms that Congress intended to confer statutory standing on a broader class of individuals than just "individuals with a disability."  (*See* Def.'s Mem. at 12.)  42 U.S.C. § 12132.  Specifically, when setting forth the "forms of discrimination prohibited by [Title II]," the House Committee on Education and Labor noted that Title II's prohibitions are "identical to those set out in the applicable provisions of [Title III]."  H.R. Rep. No. 101-485(II), at 367 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 367.  Emphasizing its intent, the House Committee on Education and Labor directed that "the construction of 'discrimination' set forth in [42 U.S.C. § 12182(b) of Title III, which explicitly prohibits discrimination on the basis of association,] should be incorporated in the regulations implementing [Title II]."  *Id.*  Moreover, the House Committee on the Judiciary report explained that "Title II [of the ADA] should be read to incorporate provisions of

10

Here, Plaintiffs, the parents of an autistic student within the DOE's educational program for children with disabilities, assert claims for discrimination under Title II of the ADA and the Rehabilitation Act based on the DOE's failure to provide their child with services under the RPM. (Compl. ¶¶ 1-3, 16, 21; *see id.* ¶¶ 92, 96-97, 99-100.) It is without question that, as the parents of W.J., Plaintiffs are associated with him. Indeed, the Supreme Court said as much in *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007): "[A] parent of a child with a disability has a particular and personal interest in [preventing discrimination against the child]." 550 U.S. 516, 529 (2007); *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 675 (E.D.N.Y. 2012) (discussing statutory standing for parents of disabled children pursuing claims under the ADA and the Rehabilitation Act; and applying the Supreme Court's reasoning in *Winkelman* to claims brought pursuant to the ADA and the Rehabilitation Act), *aff'd sub nom. Moody ex rel. J.M. v. NYC Dep't of Educ.*, 513 F. App'x 95 (2d Cir. 2013). And, as such, "it is beyond dispute that the relationship between a parent and child is sufficient" to support statutory standing under the ADA and the Rehabilitation Act. *A.M. ex rel. J.M.*, 840 F. Supp. 2d at 675 (quoting *Winkelman*, 550 U.S. at 535).

Undeterred, the DOE also argues that the ADA and the Rehabilitation Act do not, in "clear[] and unambiguous[]" terms, "provide rights to non-disabled parents . . . to bring claims, in their own right, for harms suffered by their children." (Def.'s Mem. at 14-15.) As support for this contention, the DOE cites *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357 (2025). (*Id.*) The DOE's argument, as well as its reliance on *Medina*, is unavailing. In *Medina*, the question

---

[Title III,] . . . such as [42 U.S.C. § 12112(b)(4)]," which explicitly prohibits discrimination on the basis of association. H.R. REP. 101-485(III), at 474 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 474. Thus, as the legislative history reveals Title II's protections should be read consistent with Title III's protections. Stated differently, Title II of the ADA provides a cause of action for plaintiffs alleging discrimination on the basis of association with a disabled individual.

11

presented to the Supreme Court was whether Medicaid confers an individually enforceable right to a Medicaid beneficiary, such that a beneficiary could sue state officials for noncompliance with a Medicaid condition. *Medina*, 606 U.S. at 362, 367-68 (2025). Stated differently, the *Medina* Court addressed the question of when, as a general matter, a statute supports a private right of action. *See id.* The Supreme Court concluded that "a statute secures an [individually] enforceable right . . . [when] the law in question 'clear[ly] and unambiguous[ly]' uses 'rights-creating terms[,]'" and that, even then, "the statute must display '"an unmistakable focus"' on individuals like the plaintiff." *Medina*, 606 U.S. at 369 (second and third alterations in original) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002)). Such is the case here. It is well settled that both Title II of the ADA and the Rehabilitation Act provide a private right of action. *U.S. v. Georgia*, 546 U.S. 151, 154 (2006) ("Title II authorizes suits by private citizens for money damages against public entities that violate § 12132."); *Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir. 1990) ("It is settled in this circuit that the Rehabilitation Act implicitly creates a private right of action directly against the recipients of federal funds." (first citing *Doe v. New York University,* 666 F.2d 761, 774 (2d Cir. 1981); then citing *Kampmeier v. Nyquist,* 553 F.2d 296, 299 (2d Cir. 1977))). And, as discussed, *supra*, non-disabled parents asserting claims for harms against their disabled child are, without a doubt, the types of plaintiffs contemplated by each statute. It is, therefore, plain that the ADA and the Rehabilitation Act provide enforceable rights to Plaintiffs.

Plaintiffs are within the zone of interest of Title II of the ADA and the Rehabilitation Act. This conclusion does not end the Court's inquiry, however.

## B.  Constitutional Standing

Notwithstanding any statutory standing analysis, to sustain a suit in federal court, a plaintiff must also prove that he or she has constitutional standing.  *See E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 449 (2d Cir. 2014) ("[P]arties seeking to bring suit in federal court must establish standing under Article III to assert their claims.").  It is well settled that "Article III, Section 2 of the [United States] Constitution limits the subject-matter jurisdiction of the federal courts to 'Cases' and 'Controversies.'"  U.S. Const. art. III § 2, cl. 1; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992); *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (citing *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019).  The constitutional standing doctrine is borne out of Article III as a means of "'ensur[ing] that federal courts do not exceed their authority as it has been traditionally understood.'"  *SM Kids*, 963 F.3d 206, 211 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  To prove constitutional standing, "a plaintiff must adequately establish: [](1) an injury in fact (*i.e.,* a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (*i.e.,* a '"fairly ... trace[able]"' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.,* it is '"likely"' and not 'merely "speculative"' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273-74 (2008) (quoting *Defenders of Wildlife*, 504 U.S. at 560-61).  Notably, a plaintiff "must have . . . a personal stake in the outcome of the controversy" to have constitutional standing.  *Salazar v. Buono*, 559 U.S. 700, 711 (2010) (quoting *Horne v. Flores*, 557 U.S. 433, 445 (2009)).  In other words, a plaintiff "generally must assert his [or her] own legal rights and interests[] and cannot rest his [or her] claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  As such, plaintiffs possess

"[constitutional] standing [only] to seek redress for injuries done to [them], but may not seek redress for injuries done to others." *Burton v. City of New York*, No. 97 CV 0202, 1997 WL 793105, at *2 (E.D.N.Y. Nov. 28, 1997) (internal quotation marks omitted) (quoting *Moose Lodge No. 197 v. Irvis,* 407 U.S. 163, 166 (1972)).

The DOE contends that, because Plaintiffs "failed to allege the existence of an independent injury . . . unique to them," Plaintiffs lack Article III standing to bring claims for discrimination under the ADA and the Rehabilitation Act. (Def.'s Mem. at 15.) The Court agrees.

Here, Plaintiffs allege that, despite numerous orders by impartial hearing officers directing the DOE to implement or continue implementing the RPM instruction into W.J.'s IEP, as a means of accommodating W.J.'s non-verbal autism, the DOE consistently failed to do so. (*See* Compl. ¶¶ 3, 25-27, 52, 72-73, 91-92, 96-97, 99-100, 104.) Stated differently, Plaintiffs allege that, by failing to integrate the RPM instruction in W.J.'s educational curriculum, the DOE failed to accommodate W.J.'s disability. (*Id.* ¶¶ 25-27, 96-97, 99-100, 104.) Moreover, Plaintiffs allege that they implemented at-home services under the RPM, for which they incurred costs. (*See id.* ¶ 13.) Plaintiffs also allege that the DOE reimbursed them for the at-home services. (*Id.* ¶¶ 13, 52.) Nevertheless, according to the Complaint, "[t]he reimbursements for . . . Plaintiffs' home-based lessons do not come anywhere near awarding just compensatory and punitive damages for the irreparable harm caused by [the DOE's] unlawful acts." (*Id.* ¶ 14.)

Plaintiffs contend that, because the "implementation of any [disabled] child's IEP is a matter . . . between the [DOE] and the parent[s]," the DOE's discriminatory conduct was "primarily directed at [Plaintiffs]." (Pls.' Mem. L. Opp'n Def.'s Mot. J. Plead. ("Pls.' Mem.") at 4-5, ECF No. 48.) As Plaintiffs argument goes, Plaintiffs, therefore, suffered the injury. (*Id.* at

14

5.)  Not so.  It is true that Plaintiffs engaged with the DOE regarding the implementation of services under the RPM in W.J.'s IEP.  (*See* Compl. ¶¶ 35, 81-82, 94-99.)  However, at bottom, Plaintiffs sought the RPM instruction for W.J.  (*See id.*)  And, as it logically follows, it is W.J. whom the DOE purportedly discriminated against when it failed to accommodate his disability.  That is, W.J. is the individual who suffered injury from the alleged discrimination, not Plaintiffs.  That said, the Court could certainly foresee independent harm to Plaintiffs arising from the DOE's alleged discrimination of W.J., such as the costs incurred by Plaintiffs for the at-home services.  However, here, Plaintiffs expressly concede that the DOE "indeed paid the required reimbursements to Plaintiffs from July 1, 2015 through August 31, 2021," as ordered by IHOs Farago and Wolman.  (*Id.* ¶ 13.)  Put differently, Plaintiffs concede any entitlement to compensatory damages.[6]  Nor does Plaintiffs' bid for punitive damages fare any better.  "[P]unitive damages may not be awarded . . . in suits brought under [Title II] of the ADA and . . . the Rehabilitation Act."  *Barnes v. Gorman*, 536 U.S. 181, 189 (2002).

Beyond the costs incurred by Plaintiffs for the at-home use of the RPM instruction, for which Plaintiffs concede they have received reimbursement, Plaintiffs fail to allege a single harm that they suffered distinct from W.J.  (*See* Compl.)  Rather, as the DOE aptly notes, "the Complaint is replete with [allegations of] harms and deprivations that [W.J.] endured."  (Def.'s Mem. at 15.)  Plaintiffs "failure to establish an injury and causation[,]" which is "separate and distinct from[] a disabled person's injury[,] . . . create[s] a constitutional standing issue, which,

---

[6] In their Complaint, Plaintiffs seek compensatory damages in the amount of $150 million.  (Compl.)  Plaintiffs misunderstand the purpose of compensatory damages.  As made clear by the Second Circuit, "[c]ompensatory damages, by their very nature, are awarded to make a plaintiff whole, and they are restricted in amount to the *actual* losses sustained."  *Middle E. Banking Co. v. State St. Bank Int'l*, 821 F.2d 897, 902 (2d Cir. 1987) (emphasis added) (citations omitted).  As discussed, *supra*, Plaintiffs concede that the DOE reimbursed Plaintiffs for the at-home lessons provided between July 1, 2015 through August 31, 2021.  (*Id.* ¶ 13.)  As such, Plaintiffs concede that they have been made whole and have no claim as to compensatory damages.

as [the Second Circuit said in [*Innovative*, 117 F.3d 37 (2d Cir. 1997)], is conterminous with statutory standing." *Loeffler*, 582 F.3d at 281 (2d Cir. 2009) (Wesley, J., concurring and delivering the opinion of the Court). Stated plainly, Plaintiffs lack constitutional standing.[7]

This case is readily distinguishable from *Loeffler v. Staten Island University Hospital*, 582 F.3d 268 (2d Cir. 2009), which is instructive here. In *Loeffler*, a deaf father and his non-disabled plaintiff-children made repeated requests for an American Sign Language ("ASL") interpreter leading up to, on the day of, and after the deaf individual's surgery. *Loeffler*, 582 F.3d at 271-73. However, no ASL interpreter was provided. *Id.* Instead, the plaintiff-children interpreted for their father, resulting in the plaintiff-children's frequent removal from school and depression. *Id.* at 273. Thereafter, the plaintiff-children initiated a lawsuit alleging claims under, *inter alia*, the Rehabilitation Act. *Id.* At the outset, the *Loeffler* Court grappled with whether plaintiff-children possessed statutory standing to assert associational discrimination claims under the Rehabilitation. *Id.* at 277. Recognizing that the Act's standing provision should be "interpreted . . . as broadly as possible under the Constitution," the Second Circuit determined that that the plaintiff-children possessed statutory standing. *Id.* at 280. The Second Circuit reasoned that, nevertheless, the broad scope of the statutory standing provision did not obviate the need for plaintiff-children to demonstrate "an injury causally related to, but separate and distinct from, [their] disabled [father's] injury." *Id.* In the face of this requirement, the Second Circuit determined that plaintiff-children suffered a number of distinct injuries, including forced sign language interpretation services for which they were not compensated, school absences, and emotional trauma. Here, Plaintiffs allege no such distinct injury. (*See* Compl.)

---

[7] In addition, to find that pro se Plaintiffs possessed constitutional standing to assert claims based solely on a harm suffered by their child would effectively run afoul of the longstanding rule that "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990).

And, as discussed previously, because they were reimbursed for the cost of implementing the RMP instruction at home, Plaintiffs concede the only injury that could reasonably be viewed as analogous to those injuries in *Loeffler*.

Accordingly, Plaintiffs' discrimination claims under the ADA and the Rehabilitation Act are dismissed.

## II.    Retaliation

"The ADA makes it unlawful for a[ person] to 'discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (quoting 42 U.S.C. § 12203(a)). That is, Title V of the ADA "prohibits, *inter alia*, retaliation against any individual who has asserted rights under the ADA." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). "The Rehabilitation Act . . . contain[s] similar provisions against retaliation and [is] governed in this respect by the same standards as the ADA." *Treglia*, 313 F.3d at 719 (citations omitted); *see, e.g.*, *Rodriguez v. City of New York,* 197 F.3d 611, 618 (2d Cir. 1999) ("Because . . . the Rehabilitation Act and the ADA impose identical requirements, we consider these claims in tandem."); *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir. 2001) (explaining that the Rehabilitation Act and the ADA "offer essentially the same protections for people with disabilities"). Claims for retaliation under the ADA and the Rehabilitation Act "are analyzed under the same burden-shifting framework established for Title VII cases." *Treglia*, 313 F.3d at 719. To state a claim for retaliation under the ADA and the Rehabilitation Act, a plaintiff must sufficiently allege that "(i) [he or she] was engaged in protected activity; (ii) the alleged retaliator knew that [he or she]

17

was involved in protected activity; (iii) an adverse decision or course of action was taken against [him or her]; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 148 (2d Cir. 2002) (citations omitted); *see also Sacay v. Rsch. Found. of City Univ. of New York*, 44 F. Supp. 2d 505, 508 (E.D.N.Y. 1999) (citing *Sands v. Runyon,* 28 F.3d 1323, 1331 (2d Cir. 1994)).  Of relevance here, "an adverse [decision] is 'any action that could well dissuade a reasonable [person] from making or supporting a charge of discrimination . . . . '" *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) (internal quotation marks and citations omitted) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)).

The DOE argues that, because Plaintiffs fail to allege any adverse action taken against them, Plaintiffs' claims for retaliation under the ADA and the Rehabilitation Act are ripe for dismissal.  (Def.'s Mem. at 18.)  Notably, Plaintiffs fail to specifically respond to this argument, thus conceding its validity.  *See Nunez v. Cuomo*, No. 11-CV-3457, 2012 WL 3241260, at *19 (E.D.N.Y. Aug. 7, 2012) ("Plaintiffs appear to concede Defendants' arguments, as they fail to acknowledge or contest them"); *Dolce v. Connetquot Cent. Sch. Dist.*, No. 24-CV-00622, 2025 WL 1070079, at *7 (E.D.N.Y. Apr. 9, 2025) (holding that, by "failing to respond to [an] argument" in opposition to defendants' motion to dismiss, plaintiffs "abandoned" their claim); *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 821 (S.D.N.Y. 2021) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue" (citation omitted)), *aff'd*, No. 21-1097, 2022 WL 598973 (2d Cir. Mar. 1, 2022).  On this ground, alone, dismissal of Plaintiffs' retaliation claims, brought pursuant to the ADA and the Rehabilitation Act, is warranted.[8]  In any event, the Court agrees with the DOE.

---

[8] *See Joseph*, 740 F. App'x at 14 (citing *Jackson*, 766 F.3d at 197-98) (affirming the district court's dismissal of claims as abandoned on a motion to dismiss because "[w]here a partial response to a motion is made—*i.e.*,

Here, Plaintiffs allege that, following an impartial proceeding before IHO Farago, which resulted in an order directing the DOE to, *inter alia*, incorporate the RPM instruction into W.J.'s IEP, the parties subsequently appeared before IHOs De Leon and Wolman at impartial hearings initiated by Plaintiffs.  (Compl. ¶¶ 52, 61-62, 83-84.)  According to the Complaint, during these subsequent proceedings, the DOE "mislead[], or attempt[ed] to mislead," IHOs De Leon and Wolman into "believing that the [RPM instruction] was . . . being offered to Plaintiffs [through] false and misleading sworn testimony" that W.J. was "afforded a free and appropriated public education" and received the RPM instruction "for six hours a day in school." (*Id.* ¶¶ 6, 64-66, 85.)  That is, in essence, Plaintiffs allege that, by participating in impartial proceedings and advancing positions contrary to those deemed accurate by Plaintiffs, the DOE "unlawfully retaliated" against Plaintiffs.  (*Id.* ¶ 6.)  It is axiomatic that merely participating or testifying in an adversarial proceeding does not constitute an adverse action for the purposes of a retaliation claim.  And, notably, courts in this Circuit have found that false assertions fail to constitute an adverse action without more—i.e., absent any consequence.  *See Sarno*, 183 F.3d at 159 (2d Cir. 1999) (explaining that the ADA's, and thus the Rehabilitation Act, too, and Title VII's retaliation provisions are substantially similar and, as a result, analyzing them under the same standard); *Powers v. Town of E. Hampton*, No. 24-CV-02263, 2025 WL 1726263, at *7 (E.D.N.Y. June 20, 2025) (finding in the context of a Title VII claim that "false allegations, alone, may not constitute

---

referencing some claims or defenses but not others . . .  in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."); *see also Adams*, 752 F. Supp. 2d 420, 426 (S.D.N.Y. 2010) (dismissing plaintiffs' race discrimination and age discrimination claims as abandoned where "[Plaintiffs' opposition] papers fail[ed] to address substantive grounds raised by [d]efendants' motions [to dismiss], thereby supporting a finding that the underlying claims have been abandoned."), *aff'd sub nom. Ebewo*, 460 F. App'x. 67 (2d Cir. 2012), *cert. denied sub nom. Cruz,* 568 U.S. 943 (2012); *Gill v. Phoenix Energy Management, Inc.*, No. 15CV1102, 2016 WL 11825904, at *5 (deeming retaliation claim abandoned, because "plaintiff neither dispute[d] [the d]efendant's arguments, nor defend[ed] th[e] claim in anyway" and stating that "[w]here, as here, [the p]laintiff fails to address [the d]efendant's arguments in his opposition, the [c]ourt deems [the p]laintiff's silence as a concession that [the p]laintiff is abandoning his claim.").

19

an adverse employment action"); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 784 (S.D.N.Y. 2019) (finding that, where the plaintiff not only alleged that the defendant made false allegations, but also that such allegations "directly resulted in a change in the terms of the conditions of her employment," the plaintiff sufficiently alleged an adverse action—i.e., that the defendant's "conduct could . . . have dissuaded reasonable employees"); *see also Van Dyke v. Partners of Debevoise & Plimpton LLP*, No. 12-cv-08354, 2013 WL 5375542, at *3 (S.D.N.Y. Sept. 24, 2013) (finding in the context of a Title VII claim that "retaliatory and harassing comments, malicious gossip, and leaking of sensitive information—do not constitute a materially adverse employment action.").  In the instant matter, the complaint fails to include a single allegation regarding any consequence resulting from the DOE's alleged misrepresentations at the hearings.  Indeed, Plaintiffs concede that each impartial hearing resulted in an order directing the DOE to implement or continue implementing the RPM instruction in W.J.'s IEP—that is, an order granting Plaintiff's desired relief.  (*See* Compl. ¶¶ 52, 72-73, 91.)  As such, the DOE's representations at the impartial proceeding do not constitute an adverse action.

In addition, Plaintiffs allege that the DOE failed to integrate the services under the RPM into W.J.'s IEP, as requested by Plaintiffs.  (*See* Compl. ¶¶ 112-13.)  Plaintiffs further allege that, as a result, "[the DOE] retaliated against [them]." (*Id.*)  Courts in this Circuit have long found that a defendant's "failure to make an accommodation . . . simply gives rise to a failure to a accommodate [discrimination] claim and 'cannot be boostrapped into a viable disability retaliation claim.'" *E.g.*, *Perez v. New York Presbyterian/Weill Cornell Med. Ctr.*, No. 23-CV-6152, 2024 WL 1514216, at *9 (S.D.N.Y. Apr. 8, 2024) (quoting *Robles v. Medisys Health Network, Inc.*, No. 19-CV-6551, 2020 WL 3403191, at *11 (E.D.N.Y. June 19, 2020) (quoting *Missick v. City of N.Y.*, 707 F. Supp. 2d 336, 356 (E.D.N.Y. 2010))).  As the DOE aptly argues,

20

Plaintiffs seek to bring a claim for retaliation based on conduct that "is indistinguishable from Plaintiffs' claims of discrimination"—i.e., the DOE's alleged failure to accommodate W.J. (Def.'s Mem. at 18.)  In other words, Plaintiffs' claims for retaliation are merely their discrimination claims retooled.  It is, thus, clear that the denial of Plaintiffs' accommodation request does not amount to an adverse action.  *See Perez*, No. 23-CV-6152, 2024 WL 1514216, at *9.  Plaintiffs' claims for retaliation under the ADA and the Rehabilitation Act are dismissed, accordingly.[9]

## CONCLUSION

For the foregoing reasons, Defendant's motion for judgment on the pleadings is GRANTED, and Plaintiffs' Complaint is DISMISSED.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2026

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

---

[9] Having dismissed the federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("[A] district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C.A. § 1367(c)(3))).